1
2
3
4
5
6           IN THE UNITED STATES DISTRICT COURT
7              FOR THE DISTRICT OF ARIZONA
8
9   Robert Stanley Paige,              )   No. CV-07-8089-PCT-EHC (LOA)
                                       )
10              Petitioner,            )   **REPORT AND RECOMMENDATION**
                                       )
11  vs.                                )
                                       )
12  Dora B. Schriro, et al.,           )
                                       )
13              Respondents.           )
                                       )
14  _____  )

15          This matter arises on Petitioner's Petition for Writ of Habeas Corpus.  (docket #

16  1)  Respondents[1] have filed an Answer (docket # 11) to which Petitioner has not replied and

17  the deadline has passed.

18          As an initial matter, the Court will address Petitioner's request that the Court

19  order the Arizona Superior Court or the State Attorney General to transfer their files to

20  Petitioner.  (docket # 1 at 9)  Such an order is unnecessary.  Respondents have submitted the

21  relevant portions of the record in support of their Answer and have provided Petitioner with

22  a copy of their Answer and exhibits.  (dockets # 11, # 14) Additionally, because Petitioner

23  was afforded an evidentiary hearing in his post-conviction proceeding in State court, this

24  matter is suitable for resolution on the pleadings. 28 U.S.C. § 2254(e)(2); *Schriro v.*

25  *Landrigan*, 550 U.S. 465 (2007).

26  _____

27          [1]  Petitioner named Dora B. Schriro as a respondent in this matter.  Charles Ryan, the
    current director of the Arizona Department of Corrections, is automatically substituted for Dora
28  Schriro pursuant to Fed.R.Civ.P. 25(d).

After careful review of the record, the Court concludes that trial counsel rendered ineffective assistance and that the state court's resolution of Petitioner's claim of ineffective assistance of counsel rests on an unreasonable determination of the facts and is an unreasonable application of Supreme Court precedent to the facts of this case. *See* 28 U.S.C. § 2254.

**I. Factual and Procedural Background**

On June 6, 2002, Petitioner was indicted in the Superior Court of Arizona, Yavapai County, on eight counts of dangerous crimes against children based on alleged sexual activities with a minor.  (docket # 1 at 11-12; Respondents' Exh. A at 21-23) Petitioner initially pled not guilty, rejected several plea offers, and proceeded to trial on January 14, 2004 before Judge David L. Mackey.  (docket # 1 at 12; Exh. J, Tr. 5/24/05 at 124-26)  Petitioner's defense at trial was guilty but insane. The trial ended in a mistrial on February 12, 2004 when the jury was unable to reach a verdict.  (docket # 1 at 16, Tr. 2/12/04 at 22-23)  Thereafter, the parties negotiated a plea agreement.  (docket # 1; Respondents' Exh. C, Tr. 7/16/04 at 54-56; docket # 14)  Judge Mackey, and later Judge Kiger, participated in the plea negotiations.  (docket # 1 at 14)  The plea agreement provided that Petitioner would plead guilty to Counts I and VIII of the indictment, and that the State would dismiss the remaining counts.  (docket # 14)   Specifically, Petitioner would plead guilty to attempted sexual conduct with a minor (Count I), and to sexual abuse (Count VIII), both class 3 felonies.  (docket # 14)  The written plea agreement provided that Count I carried "a presumptive sentence of **10 years**; a minimum sentence of **5 years**; and a maximum sentence of **15 years**."  (docket # 14) (emphasis in original)   The plea agreement also provided that Count VIII carries "a presumptive sentence of **5 years**; a minimum sentence of **2.5 years**; and a maximum sentence of **7.5 years**."  (docket # 14 ) (emphasis in original).

In a section entitled "Special conditions regarding sentence, parole, or commutation, if any," the written plea agreement specified that, "[p]ursuant to A.R.S. § 13-902(E), the Court may, in lieu of prison, order that the Defendant be supervised on probation

1  for any term from five years up to the rest of Defendant's life." (docket # 14)  That same

2  section also stated that "**DEFENDANT SHALL BE SENTENCED TO THE**

3  **DEPARTMENT OF CORRECTIONS WITH REFERENCE TO COUNT VIII OF**

4  **THE INDICTMENT FOR A TERM OF NOT LESS THAN 5 YEARS.**" (docket # 14)

5  (emphasis in original).  The "Special Conditions" section also enumerated 17 specific

6  conditions that the court would impose if Petitioner were placed on probation.  (docket # 14)

7  Finally, the written plea agreement specified that "it is the Court's duty to impose sentence

8  upon the Defendant and that any sentence either stipulated to or recommended herein . .. is

9  not binding upon the Court. . . ."  (docket # 14)

10       On April 30, 2004, the trial court[2] conducted a change of plea hearing.  At the

11  commencement of that hearing, the written plea agreement was not yet signed and

12  authorized by the State of Arizona through the Yavapai County Attorney because the county

13  attorney "would not sign an agreement that is not approved by the people whose lives were .

14  . . greatly impacted by this conduct . . . ."  (Respondents' Exh. A at 3)  The court explained

15  "that's the State's prerogative to determine under which circumstances they're (sic) going to

16  offer a plea agreement."  (Respondents' Exh. A at 3)

17       After noting that the State had not yet signed the plea agreement because it was

18  awaiting approval from the victim's family, the trial court addressed the victim and her

19  mother in court, in Petitioner's presence, and explained the plea agreement's sentencing

20  range:

21       The plea agreement that I have in front of me indicates that [Petitioner]
         would plead guilty to an attempted sexual conduct with a minor, a class
22       three felony, and a sexual abuse, a class three felony.  The range of sentences
         available to the Court, based upon this plea agreement, would be a minimum
23       of — a stipulated minimum of five years in the Arizona Department of
         Corrections . . . .

24
         The maximum term that would be available to the Court for a sentence
25       under this plea agreement would be 22 ½ years in the Arizona Department
         of Corrections.  And there would be some possibilities of a prison term and
26       lifetime probation within those ranges.

27  _____

28       [2]  The Honorable David L. Mackey presided.

- 3 -

1
2
3

> And, as I read this plea agreement, it would allow the Court to impose a 7 ½ year prison term, up to a 7 ½ year prison term, followed by lifetime probation. That lifetime probation could begin with one year in the Yavapai County Jail.

(Respondents' Exh. A, Tr. 4/30/04 at 3-4)

4
5

Judge Mackey explained that he

6
7

> wanted to give both sides an opportunity to ask [the court] any questions they might have or see whether there's any misunderstanding. Because right now - and I'm not in a position to tell anybody that they have to agree to this - - this is an agreement that would only take place if everyone is in agreement.

8   (Respondents' Exh. A at 5)

9   The victim's mother stated that "with the plea that's written up today – or the

10  plea, I'm sorry, that was offered yesterday would put a cap on [Petitioner's prison term] and

11  tie [the court's] hands to give him a maximum of seven and a half years . . . ."

12  (Respondents' Exh. A at 5)   The victim's mother also expressed concern that Petitioner

13  could be released from prison after a few years and, if not placed on probation, re-offend.

14  (Respondents' Exh. A at 6-7)  The court responded that a 7 ½ year sentence plus lifetime

15  probation was one possible sentence available under the agreement, and that the court also

16  had the option of sentencing Petitioner to over 22 years imprisonment:

17
18
19

> This plea agreement *would allow up to a 22 ½ year prison term* without lifetime probation and still require [Petitioner] to submit his DNA into a databank with the U.S. Department of Safety; Would require him to register as a sex offender for the rest of his life.

20
21

> And while the probation would provide some monitoring by a probation officer, it would not prevent [Petitioner] from, if that was his predilection, [finding] ways to have contact with young people.  It would be a violation of his probation and it would probably be a new crime, depending upon what that contact was, for which he would face consequences.

22
23
24
25
26

> I'm just concerned that you're seeing the lifetime probation as a greater protection than those of us who are, unfortunately, involved in this system recognize that it is.  It's an important feature and it may be one that, under this plea agreement, I decide is appropriate after a prison term or after a prison term followed by some jail term as well.  But this plea agreement, also, given [Petitioner's] age [52], gives this Court the authority to put him in custody today, if it's entered into today, and ensure that he would not be out in the public again for *22 ½ years* less credit for time served.

27  (Respondents' Exh. A at 7-8, 12) (emphasis added).

28

After a short recess, the victim and her mother consented to the plea agreement and the prosecutor signed it.  (*Id.* at 11)   The trial court then engaged Petitioner in a plea colloquy to determine whether he understood the agreement and if it contained all the terms to which he had agreed.  The court also inquired whether Petitioner had consumed any drugs, alcohol, or medication before the hearing, and how such drugs affected him:

> Q.  Have you had any drugs, alcohol or medicine in the last twenty-four hours?
>
> A.  Yes.
>
> Q.  And what is that?
>
> A.  Remeron, Lorazepam, and Paxil.[3]
>
> Q.  And how long have you been taking all three of those medications?
>
> A.  Oh, pretty much the year and a half since I've been out.
>
> Q.  Are those medications acting normally for you today?
>
> A.  Yes.
>
> Q.  You're not experiencing any different reaction to those medications?
>
> A.  No.
>
> Q.  Do you understand what we're talking about today?
>
> A.  Yes.

---

[3]   Remeron is a specific brand of Mirtazapine which is used to treat depression. Mirtazapine is classified as an antidepressant. It works by increasing certain types of activity in the brain to maintain mental balance.

Paxil is a specific brand of Paroxetine which is used to treat depression, panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks), and social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life).

Lorazepam is used to relieve anxiety.
(See, www.nlm.nih.gov/medlineplus/druginfo/)

(Respondents' Exh. A at 16-17)   The court also asked Petitioner about his understanding of the plea agreement and whether it reflected all of the agreements related to his plea:

Q.  Have you read this plea agreement?

A.  Yes.

Q.  Has your attorney had the opportunity to explain it all to you?

A. Yes.

Q.  Do you understand it?

A.  Yes.

Q.  Do you agree with everything that's in it ?

A.  Yes.

Q. Do you have any agreements with the State that are not included in this plea agreement?

A.  Not that I know of.

* * *

Q.  Now, you indicated that there wasn't any other agreement that you knew of.  I want to make sure that you understand that once we go through this plea agreement, that is the document I'll be relying upon that sets forth any agreement that you have with the State of Arizona about what's going to happen to you.  *Any agreements that your attorney might have told you about all have to be in here in writing.*

Is this the complete agreement with respect to what's going to happen to you?

A.  I assume so.  *There was (sic) some intentions that weren't —*

Mr. Griffen: Judge, can we stop for a second?

The Court: Yes.

Mr. Griffen: Judge, because of some of the things that have been bandied about this morning, there was some concern something was changed.  We're clear it's the same agreement as yesterday.

The Defendant: Right.

Q [the Court]:   [Petitioner], I want you to understand, while there has been a lot of discussion back and forth this morning and a lot of discussion back and forth before today, I want you to take a moment with your attorney, glance through the pages — Mr. Griffen, let me hand this one to you; this is the one I'm working off of — look at each page and make sure you see that there have been no other changes.

A. Yes, it appears to be the same.

Q. *That plea agreement sets forth all the agreements that you have about what's going to happen to you?*

A. (Nodding.)

Q. Yes?

A. Yes.

(Respondents' Exh. A at 12-14)(emphasis added)

The court emphasized that Petitioner had "an absolute right" to plead not guilty and "proceed with the jury trial that's set next week." (Respondents' Exh. A at 14) Petitioner indicated that he understood that right and chose to forego his right to a jury trial and the related rights. (Respondents' Exh. A at 14-15)  The court further explained Petitioner's sentencing exposure, and Petitioner stated that he understood he could face over 22 years in prison:

Q. [T]he plea agreement tells me you're going to plead guilty to an attempted sexual conduct with a minor, a class three felony, as well as sexual abuse, a class three felony.

Do you understand that a class three felony, attempted sexual conduct with a minor, carries a presumptive term in the Arizona Department of Corrections of ten years, a minimum term of five years, and a maximum term of fifteen years?

A. Okay.

Q. Yes?

A. Yes.

Q. And do you understand that the sexual abuse, a class three felony, carries a presumptive term in the Arizona Department of Corrections of five years, minimum term of two and a half years, and a maximum of seven and a half years?

A. Yes.

Q. Now, the plea agreement tells me *you've agreed that probation is available* on the attempted sexual conduct with a minor.  Is that in fact your agreement?

A. Yes.

Q. Do you understand that *that agreement is not binding* upon the Court but that I can determine whether to give a prison term or a lifetime probation term on that count?

1       A.  Yes.

2       Q.  And that if I were to give you a probationary term on that count, that probationary term could be and likely would be for the rest of your life.
3       Do you understand that?

4       A.  Yes, sir.

5       * * *

6       Q.  Now, with respect to the other count, there's a stipulation that your sentence would not be any less than five years.  Is that in fact your
7       agreement?

8       A.  Yes.

9       * * *

10       Q.  Do you understand that you need to consider that the prison terms you could receive on these offenses would be for as much as *22 ½ years and*
11       *that you may have to serve all of that 22 ½*, less credit for the approximately six months that you've served in the Yavapai County Jail? Do you understand
12       that?

13       A.  Yes.

14  (Respondents' Exh. A at 17-20)(emphasis added)

15       The Court further questioned defense counsel, Bruce Griffen, regarding

16  Petitioner's ability to understand the proceedings and enter the plea:

17       Q.  Mr. Griffen, you've had an opportunity to meet with your client today and on prior occasions.  Do you believe that medication is
18       affecting his ability to understand what's going on today?

19       A.  No, it's positive help to him and it's the same as he's represented.  I think he's thinking clearly.  I've had extensive negotiations with Rob
20       over the last week and over the last day and today and there's been no indication of any problems with his thought process.  It's solid.

21       I've also consulted with his treating psychologist who has represented
22       to me that he has performed well over the last several weeks, despite the various pressures that are ongoing, and that they see no change in
23       his mental ability.

24  (Respondents' Exh. A at 17)   Before accepting Petitioner's plea, the court again inquired

25  whether counsel had "any questions as to the voluntariness of the plea"  (Respondents' Exh.

26  A at 23)  Petitioner's counsel indicated that he had no questions regarding the voluntariness

27  of the plea.  (Respondents' Exh. A at 23)  The court then asked if "either counsel [was]

28

1    aware of anything the Court has left out." (Respondents' Exh. A at 23) Counsel responded

2    that he was not aware of "anything the Court [had] left out." (Respondents' Exh. A at 23)

3            The court specifically asked Petitioner "based upon the discussions we had in

4    court, do you have any other questions for [the court] with respect to what will happen to

5    you based upon this plea." (Respondents' Exh. A at 24) Petitioner replied, "No. I (sic) just

6    wait for the next legal happening." (Respondents' Exh. A at 24) The trial court then found

7    that Petitioner had knowingly, intelligently, and voluntarily entered a plea of guilty to the

8    offenses set forth in the plea agreement (Counts I and VIII of the Indictment) and accepted

9    his plea. (Respondents' Exh. A at 24)

10           An aggravation/mitigation hearing took place before Judge Mackey on July 15,

11   2004. (Respondents' Exh. B) At the beginning of the hearing, Petitioner and the State

12   agreed to amend the plea agreement to include a waiver of Petitioner's right to a jury trial on

13   aggravating factors pursuant to *Blakely v. Washington*, 542 U.S. 296 (2004). (Respondents'

14   Exh. B, Tr. 7/15/04 at 2-3) Before accepting the amendment to the plea agreement, the

15   court again ensured that Petitioner understood the sentencing range.

16           Q. The plea agreement that you've entered into provided for a range
         of prison from down as low as five years plus lifetime probation, to as
17       much as 22 ½ years. You remember that?

18           A. Yes.

19   (Respondents' Exh. B at 3)

20           Following a two-day aggravation/mitigation hearing, on July 16, 2004, the trial

21   court sentenced Petitioner to an aggravated term of 15 years imprisonment on Count 1

22   (attempted sexual conduct with a minor), and a consecutive presumptive term of 5 years

23   imprisonment on Count VIII (sexual abuse). (Respondents' Exh. B, Exh. C at 54-58; Exh. D

24   at 1-2) The remaining six counts of the indictment were dismissed on the State's motion.

25   (Respondents' Exh. C at 59)

26           On October 12, 2004, Petitioner, through counsel, timely filed a notice of post-

27   conviction relief. (Respondents' Exh. F) On December 22, 2004, Petitioner filed a petition

28   for post-conviction relief, claiming his guilty plea was involuntary because: (1) the

1    sentencing judge, the Honorable David Mackey, suggested during plea negotiations that he

2    would sentence Petitioner to between 2.5 and 7.5 years imprisonment on Count 1 and

3    suspend imposition of sentence on Count 2[4] and place Petitioner on lifetime probation, and

4    Petitioner pled guilty in reliance on those assurances; and (2) Petitioner was "under the

5    influence of psychotropic medication [anti-anxiety drug Lorazepam at the time of his guilty

6    plea to an extent that made him unable to make a voluntary decision." (Respondents' Exh.

7    F) Petitioner further argued that defense counsel, Mr. Griffen, was ineffective in advising

8    him that Judge Mackey would impose between 2.5 and 7.5 years imprisonment on Count 1

9    and place Petitioner on lifetime probation on Count 2, and that such ineffective assistance

10   induced him to plead guilty. (Respondents' Exh. F at 8)

11          Because Judge Mackey was a potential witness, the case was transferred to Judge

12   Janis Sterling who conducted an evidentiary hearing. (Respondents' Exh. H) Petitioner also

13   moved to disqualify the Yavapai County Deputy Attorney, Thomas Thurston, who

14   prosecuted the case because he, too, was a potential witness. (Respondents' Exh. I) The

15   court denied Petitioner's motion to disqualify Thurston. (Respondents' Exh. H)

16          At the post-conviction hearing, Petitioner presented Judge Mackey, who testified

17   that he did not recall advising the parties that he was inclined to impose any particular

18   sentence. (Respondents' Exh. J, Tr. 5/24/05 at 17-20, 26-27, 46) Likewise, Terry Gray, a

19   paralegal with the Yavapai County Attorney's office who attended the plea negotiations,

20   testified that she did not recall Judge Mackey making a promise to impose a particular

21   sentence. (Respondents' Exh. K, Tr. 6/7/05 at 33, 36, 46) Judge Mackey did not have a

22   detailed recollection of the plea negotiations. He admitted that he often held off-the-record

23   conversations with counsel and that, if Petitioner was not present, there would be no court

24

25   ─────────────

26        [4] Because the parties refer to "Count 1 and 2", rather than the specific counts of the
     Indictment to which Petitioner plead guilty (Count I - attempted sexual conduct, and Count VIII
27   - sexual abuse), the record is a bit confusing. The parties seem to refer to the attempted sexual
     conduct charge as Count 1 and to the sexual abuse charge as Count 2, thus, the Court will use
28   this same manner of identification.

1    reporter.  (Respondents' Exh. J, Tr. 5/24/05 at 8, 14-19, 23-27, 32, 40, 45)  He testified that

2    one settlement conference had occurred before a different judge, Judge Kiger.

3           Judge Mackey testified that he informed the parties that he "would have a much

4    easier time" accepting a plea agreement that included the option of lifetime probation on the

5    sexual abuse count, if the plea agreement provided for a stipulated sentence on the attempted

6    sexual conduct count.  (Respondents' Exh. J, Tr. 5/24/05 at 7, 13-14, 25)  Judge Mackey

7    also testified that he told the parties he would "consider" imposing a sentence of 5 to 7.5

8    years imprisonment followed by lifetime probation.  (Respondents' Exh. J at 23)  Judge

9    Mackey testified that if he had been inclined to impose a particular sentence, he would have

10   said so on the record.  He also specifically recalled discussing the available sentencing range

11   with the victim's mother in court in Petitioner's presence.  (Respondents' Exh. J at 41-43)

12          Judge Mackey further testified that he was aware of Petitioner's history of mental

13   illness and recalled inquiring whether his medications were affecting him differently than

14   usual the day of the change-of-plea hearing.  (Respondents' Exh. J at 28-31, 38-40)  He

15   recalled that Petitioner had responded negatively.  Judge Mackey testified that he observed

16   nothing during the change-of-plea hearing which suggested that Petitioner did not

17   understand the change-of-plea proceedings.  (Respondents' Exh. J at 27-29, 38-40)

18   Similarly, Petitioner's trial counsel, Mr. Griffen, testified at the post-conviction hearing that

19   Petitioner did not appear impaired during the change-of-plea hearing.  (Respondents' Exh. J

20   at 38-40)

21          Griffen also testified about the plea negotiations.  (Respondents' Exh. J at 59-81,

22   91)  He testified that he tried to negotiate a plea agreement with a sentencing range of 2.5 to

23   7.5 years imprisonment followed by lifetime probation.  (Respondents' Exh. J at 66-67)  He

24   testified that Judge Mackey indicated several times, but not in Petitioner's presence, that if

25   Petitioner entered the plea agreement, the appropriate sentence would be prison between 2.5

26   to 7.5 years, followed by lifetime probation.  (Respondents' Exh. J at 67-83)  Griffen

27   testified that Judge Mackey gave him the impression that he would impose a sentence of 5 to

28

1   7.5 years imprisonment followed by lifetime probation.  (Respondents' Exh. J at 71-80, 84)

2   Griffen opined that Judge Mackey wanted the option of imposing probation.  (Respondents'

3   Exh. J at 109-11)  Griffen testified that he advised Petitioner to accept the plea offer

4   because, based on his 25 years of experience, a judge - including Judge Mackey - would not

5   "backtrack" on his representations regarding sentencing.  (Respondents' Exh. J at 80-81)

6   Griffen testified that he "made sure [Petitioner] understood there was no guarantee (as to the

7   sentence the Judge would impose), and that [he didn't] think [Petitioner] misunderstood

8   that."  (Respondents' Exh. J at 81-82, 96, 99, 117-19)   Griffen further testified that he "also

9   told [Petitioner], quite strongly, that in [his] opinion, . . . every indication was . . . that the

10  judge was championing, he was the leader, . . . trying to pursue a plea that gave probationary

11  discretion, and that [Griffen believed] that was [the judge's] intention. . . ."  (Respondents'

12  Exh. J at 81)  Griffen testified that Petitioner would not have accepted the plea offer absent

13  his advice.  (Respondents' Exh. J at 54, 80)  Griffen further opined that Petitioner was

14  competent to plead guilty the day of the change-of-plea hearing and that he was not

15  impaired.  (Respondents' Exh. J at 106-08)

16          Petitioner also testified at the post-conviction hearing.  He testified that Griffen

17  told him that Judge Mackey would impose five years imprisonment on Count 1 and suspend

18  sentence on Count 2 and sentence Petitioner to lifetime probation.  (Respondents' Exh. J at

19  125-27)  He testified that Griffen told him that the written plea agreement would "say . . .

20  that you can get [prison time on count 2], but . . . what they are telling you when they put

21  probation eligible," is that the judge will impose probation.  (Respondents' Exh. J at 127)

22  Petitioner further testified that Griffen told him that Judge Mackey had indicated that he

23  would impose probation and that, based on Griffen's 25 years in practice, judges do not "go

24  back" on their word.  (Respondents' Exh. J at 128, 130-31, 145)  Petitioner also testified that

25  Griffen explained to him that the written plea agreement did include a specific sentence

26  because judges in Yavapai county would not "stipulate to an exact sentence."  (*Id.* at 127)

27  However, Griffen also told Petitioner that Judge Mackey's representation during plea

28

1   negotiations that he would impose lifetime probation on count 2 was "as close as you're

2   going to get to a guarantee around here." (Respondents' Exh. J at 128)   Petitioner testified

3   that, when Judge Mackey asked during the change of plea hearing if the written plea

4   agreement was "the complete agreement," he attempted to discuss the alleged promise

5   regarding sentencing, but Griffen dissuaded him from doing so. (Respondents' Exh. J at

6   138-39; Exh. A at 12-14)   Petitioner testified that Griffen said, "answer this right."

7   (Respondents' Exh. Tr. 138-39)

8           Petitioner further testified that he had practiced as a registered nurse for twenty-

9   five years and is familiar with medications. (Respondents' Exh. J at 120-21)   He stated that

10   he ingested six times his usual dose of Lorazepam, which he took to control panic attacks,

11   before the change-of-plea hearing because he was extremely nervous. (Respondents' Exh. J

12   at 122-23, 136-38)   As a result, Petitioner testified that he was "unconscious" during the

13   change-of-plea hearing, and that counsel had to wake him up to sign the plea agreement.

14   (Respondents' Exh. J at 138-39)   He also claimed that, because of the large dose of

15   Lorazepam, he did not remember the court discussing the sentencing range at the change-of-

16   plea hearing. (Respondents' Exh. J at 146)

17           Petitioner's ex-wife testified that he appeared "passive" at the change-of-plea

18   hearing, appeared to not understand the proceeding, and did not remember the proceeding.

19   (Respondents' Exh. J at 161-64)   Petitioner's friend Dr. Julia Williams, an emergency room

20   physician, testified that the quantity of Lorazepam that Petitioner allegedly consumed would

21   have made him sleepy, confused, and vulnerable to suggestion. (Respondents' Exh. K at 19-

22   20, 28-30)   Williams also testified that "even a lay person," like Judge Mackey, likely would

23   have noticed if Petitioner was excessively sedated. (Respondents' Exh. K at 28-29)

24           The victim's mother, a registered nurse who had known Petitioner socially for

25   four years and had worked with him in the ambulatory surgery department at the Verde

26   Valley Medical Center, testified that she did not observe Petitioner fall asleep or appear

27   confused during the change-of-plea hearing. (Respondents' Exh. K at 58-65)

28

1       The trial court rejected Petitioner's claims and concluded that under "the totality

2  of the circumstances and the facts as noted in [the court's] findings, this Court concludes, as

3  a matter of law, that Defendant/Petitioner knowingly, intelligently, and voluntarily entered

4  into a plea agreement with the State of Arizona."  (Respondents' Exh. L at 6)

5       On September 30, 2005, Petitioner filed a petition for review with the Arizona

6  Court of Appeals.  (Respondents' Exh. M)  Petitioner argued that the trial court erred in

7  rejecting his claims that (1) Judge Mackey's off-the-record representations to the parties

8  regarding sentence induced him to plead guilty; (2) counsel's ineffectiveness and erroneous

9  advice regarding sentence rendered his pleas involuntary; and (3) Petitioner's consumption

10  of a large dose of Lorazepam and resulting impairment rendered his plea involuntary. (*Id.*)

11  The Court of Appeals summarily denied review on August 4, 2006.  (Respondents' Exh. O)

12       On August 29, 2006, Petitioner filed a petition for review in the Arizona

13  Supreme Court, arguing that his plea was involuntary due to Judge Mackey's off-the-record

14  promises and trial counsel's "incompetent statements and assurances that reinforced the false

15  promise."  (Respondents' Exh. P)  On November 11, 2006, the Arizona Supreme Court

16  denied review.  (Respondents' Exh. Q)

17       Thereafter, Petitioner filed a timely Petition for Writ of Habeas Corpus in this

18  Court raising the following claims:

19      1. Petitioner's guilty plea was involuntary because:

20        a.  He relied on Judge Mackey's representations regarding sentencing;

21        b.  He was "over-medicated" with prescription drugs during the plea
      negotiations and during the change-of-plea hearing; and

22

23        c.  He relied on trial counsel's "avowals" in deciding to plead guilty.

24      2. Counsel was ineffective in advising Petitioner that the trial court would
    sentence Petitioner to five years' imprisonment on Count 1, and suspend
    sentence on Count 2 and place Petitioner on lifetime probation.

25

26  (docket # 1 at 10-41)  After discussing the law regarding exhaustion and the applicable

27  standard of review, the Court will consider Petitioner's claims that are properly before it.

28

**II.  Exhaustion and Procedural Bar**

A federal court may not grant a petition for writ of habeas corpus unless the petitioner has exhausted the state remedies available to him.  28 U.S.C. § 2254(b).  When seeking habeas relief, petitioner bears the burden of showing that he has properly exhausted each claim.  *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981) (*per curiam*).  The exhaustion inquiry focuses on the availability of state remedies at the time the petition for writ of habeas corpus is filed in federal court.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  The prisoner "shall not be deemed to have exhausted . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).  In other words, proper exhaustion requires the prisoner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. 845.  "One complete round" includes filing a "petition[] for discretionary review when that review is part of the ordinary appellate review procedure in the State."  *Id.*   State prisoners may skip a procedure occasionally employed by a state's courts to provide relief only if a state law or rule precludes use of the procedure, or the "State has identified the procedure as outside the standard review process and has plainly said that it need not be sought for purposes of exhaustion."  *Id.* at 848, 850.

In this case, Respondents argue that because Petitioner did not present Ground 1(b) to the Arizona Supreme Court, that claim is unexhausted.  (docket # 11 at 15-18)  As discussed below, Petitioner was not required to present his claim to the Arizona Supreme Court to satisfy the exhaustion requirement of § 2254(b).

To exhaust state remedies, a petitioner must afford the state courts the opportunity to rule upon the merits of his federal claims by "fairly presenting" them to the state's "highest" court in a procedurally appropriate manner.  *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (stating that "[t]o provide the State with the necessary 'opportunity,' the prisoner must "fairly present" her claim in each

1    appropriate state court . . . thereby alerting the court to the federal nature of the claim.").

2    Contrary to Respondents' assertion, in Arizona, unless a prisoner has been sentenced to

3    death, the "highest court" requirement is satisfied if the petitioner has presented his federal

4    claim to the Arizona Court of Appeals either on direct appeal or in a petition for post-

5    conviction relief.  *Crowell v. Knowles* , 483 F.Supp.2d 925 (D.Ariz. 2007) (discussing

6    *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

7            Relying on *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999) and *Baldwin v.*

8    *Reese*, 541 U.S. 27 (2004), Respondents argue that to properly exhaust federal claims, a

9    petitioner is required to present those claims to the Arizona Supreme Court.  (docket # 11 at

10   15-18)  *Swoopes* does not support this assertion.  Although less than a life sentence had been

11   imposed in *Swoopes*, the Ninth Circuit broadly stated that "Arizona state prisoners need not

12   appeal an Arizona Court of Appeals' denial of post-conviction relief to the Arizona Supreme

13   Court in order to exhaust their state remedies for federal habeas corpus purposes, except in

14   capital cases or cases involving the imposition of a life sentence." 196 F.3d at 1008.  In

15   support of this conclusion, *Swoopes* included undated citations to A.R.S. §§ 120.21(A)(1),

16   12-120.24, and 13-4031, and citations to Ariz.R.Crim.P. 31, *State v. Shattuck*, 140 Ariz. 582,

17   684 P.2d 154 (1984), *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989), and *Moreno v.*

18   *Gonzalez*, 192 Ariz. 131, 962 P.2d 205 (1989).  *Swoopes*, 196 F.3d at 1009-10.  As the court

19   noted in *Crowell v. Knowles*, 483 F.Supp.2d 925, 930 (D.Ariz. 2007), "none of those

20   authorities — either at the time of *Swoopes* or now — support the proposition that Arizona

21   Supreme Court review remains part of the standard review process necessary for exhaustion

22   in cases carrying *life sentences*.  *Id*. (emphasis in original).  Rather, to the extent those

23   authorities mentioned life imprisonment, it was in reference to outdated versions of A.R.S. §

24   12-201.21(A)(1) and 13-4031.  In 1989, years before *Swoopes* was decided, A.R.S. § 12-

25   120.21(A)(1) & § 13-4031 were amended to omit the phrase, "or life imprisonment."  "The

26   effect of this change was to give the Arizona Court of Appeals jurisdiction over criminal

27

28

1  convictions carrying life sentences and eliminate the [Arizona] Supreme Court's exclusive

2  and mandatory jurisdiction." *Crowell*, 483 F.Supp.2d at 928.

3          The erroneous statement of the law included in *dictum* in *Swoopes* was repeated

4  in *dictum* in *Castillo v. McFadden*, 399 F.3d 993 (9th Cir. 1994) and several district cases.

5  *See*, *Crowell,* 483 F.Supp.2d at 930 and n. 4 (compiling cases).  These cases, however,

6  "present a tale of zombie precedent.  A rule definitively extinguished by statutory

7  amendment in 1989 continues to prowl, repeatedly re-animated by mistaken citation and

8  dicta."  *Id.* at 931.

9          Accordingly, in *Crowell*, the court found that "[s]ince 1989, the Arizona

10  Supreme Court has not had exclusive appellate jurisdiction over cases carrying life

11  sentences, and petitioners who have received a life sentence have not had a right to State

12  Supreme Court review."  *Id.*  The court went on to hold that:

13          In sum, the language of *Swoopes* on life sentences was dictum
            unnecessary for the correct disposition of that case.  The subsequent
14          repetition of that dictum as dictum in other cases does not change
            its character.  Nor do any of the dicta undercut the clarity of the
15          pronouncement by the Arizona Supreme Court, together with the
            1989 enactments of the Arizona Legislature, that discretionary review
16          in non-capital cases is 'unavailable' for purposes of federal habeas
            exhaustion.
17
*Id*. at 933.  The *Crowell* court found that petitioner, who had received a life sentence, had
18
exhausted his federal claims by presenting them to the Arizona Court of Appeals.  *Id.*   The
19
court further noted that the *Swoopes* decision supported its conclusion.  *Id.*  The court
20
explained that, "[a]pplying *O'Sullivan*, *Swoopes* held that 'Arizona has declared that its
21
complete round [of appellate review] does not include discretionary review before the
22
Arizona Supreme Court.'" 483 F.Supp.2d at 933 (quoting *Swoopes*, 940 F.3d 1308).  The
23
*Crowell* court concluded that "there is no longer any basis for distinguishing among non-
24
capital sentences under 28 U.S.C. § 2254(c) in light of the 1989 amendments to A.R.S. § 12-
25
120.21(A)(1) and 13-4031."  *Crowell*, 483 F.Supp.2d at 933.
26
        In accordance with Arizona law and the thorough discussion in *Crowell*, to
27
properly exhaust his federal claims, Petitioner was not required to present his claims to the
28

1    Arizona Supreme Court.  Rather, the "highest court" requirement is satisfied by fair

2    presentation to the Arizona Court of Appeals.

3        The Supreme Court's decision in *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) does

4    not require a different conclusion.  Respondents argue that pursuant to *Baldwin*, non-capital

5    defendants must exhaust their claims in the Arizona Supreme Court.  Respondents'

6    argument hinges on the following language in *Baldwin*, "[t]o provide the State with the

7    necessary 'opportunity,' [to rule on his claims] the prisoner must 'fairly present' his claim in

8    each appropriate state court (*including a state supreme court with powers of discretionary*

9    *review*), thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at

10   29 (emphasis added) (citations omitted).  Respondents latch onto a single phrase, "including

11   a state supreme court with powers of discretionary review," to support their argument and

12   ignore the basis for this statement.  In *O'Sullivan*, the Supreme Court explained that proper

13   exhaustion requires the prisoner to "give the state courts one full opportunity to resolve any

14   constitutional issues by invoking one complete round of the State's established appellate

15   review process." *O'Sullivan*, 526 U.S. 845. "One complete round" includes filing a

16   "petition[] for discretionary review *when that review is part of the ordinary appellate review*

17   *procedure in the State*." *Id.* (emphasis added).

18       As previously stated, "Arizona has declared that its complete round [of appellate

19   review] does not include discretionary review before the Arizona Supreme Court." *Swoopes*,

20   940 F.3d 1308.  Thus, contrary to Respondents' assertion, *Baldwin* does not require a non-

21   capital prisoner, such as Petitioner, to present his claims to the Arizona Supreme Court.

22       In summary, Petitioner properly exhausted all of his federal claims raised in the

23   pending Petition for Writ of Habeas Corpus by fairly presenting those claims to the Arizona

24   Court of Appeals.

25   **III.  Standard of Review**

26       In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

27   ("AEDPA") which "modified a federal habeas court's role in reviewing state prisoner

28

1   applications in order to prevent federal habeas 'retrials' and to ensure that state-court

2   convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S.

3   685, 693 (2002).

4          Under the AEDPA, a federal court may not grant a habeas petition "with respect

5   to any claim that was adjudicated on the merits in state court" unless the state court's

6   decision was either (1) "contrary to, or involved an unreasonable application of, clearly

7   established Federal law, as determined by the Supreme Court of the United States;" or (2)

8   "based on an unreasonable determination of the facts in light of the evidence presented in

9   the State court proceeding." 28 U.S.C. § 2254(d)(1),(2); *Carey v. Musladin*, 549 U.S. 70

10  (2006); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003); *Mancebo v. Adams*, 435 F.3d 977,

11  978 (9th Cir. 2006). To determine whether a state court ruling was "contrary to" or involved

12  an "unreasonable application" of federal law, courts look exclusively to the holdings of the

13  Supreme Court which existed at the time of the state court's decision. *Mitchell v. Esparza*,

14  540 U.S. 12, 15-15 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). When no decision

15  of the Supreme Court "squarely addresses" an issue or provides a "categorical answer" to

16  the question before the state court, § 2254(d)(1) bars relief. *Moses v. Payne*, ___ F.3d ___,

17  2008 WL 4192031 (9th Cir. 2008). Accordingly, the Ninth Circuit has acknowledged that it

18  cannot reverse a state court decision merely because that decision conflicts with Ninth

19  Circuit precedent on a federal constitutional issue. *Brewer v. Hall*, 378 F.3d 952, 957 (9th

20  Cir. 2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

21         Even if the state court neither explained its ruling nor cites United States

22  Supreme Court authority, the reviewing federal court must nevertheless examine Supreme

23  Court precedent to determine whether the state court reasonably applied federal law. *Early*

24  *v. Packer*, 537 U.S. 3, 8 (2003). The United States Supreme Court has expressly held that

25  citation to federal law is not required and that compliance with the habeas statute "does not

26  even require awareness of our cases, so long as neither the reasoning nor the result of the

27  state-court decision contradicts them." *Id.*

28

1       A state court's decision is "contrary to" federal law if it applies a rule of law

2   "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set

3   of facts that are materially indistinguishable from a decision of [the Supreme Court] and

4   nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v.*

5   *Esparza*, 540 U.S 12, 14 (2003) (citations omitted); *Williams v. Taylor*, 529 U.S. 362, 411

6   (2000).

7       A state court decision is an "unreasonable application of" federal law if the court

8   identifies the correct legal rule, but unreasonably applies that rule to the facts of a particular

9   case. *Williams*, 529 U.S. at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005).   An incorrect

10  application of federal law does not satisfy this standard.  *Yarborough v. Alvarado*, 541 U.S.

11  652, 665-66 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the state

12  court's decision is objectively unreasonable.") "It is not enough that a federal habeas court,

13  in its independent review of the legal question," is left with the "firm conviction" that the

14  state court ruling was "erroneous." *Id.*; *Andrade*, 538 U.S. at 75.  Rather, the petitioner must

15  establish that the state court decision is "objectively unreasonable."  *Middleton v. McNeil*,

16  541 U.S. 433 (2004); *Andrade*, 538 U.S. at 76.

17      In conducting an analysis under the AEDPA, the habeas court considers the last

18  reasoned state court decision addressing the claim.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803

19  (1991). Additionally, the habeas court presumes that the state court's factual determinations

20  are correct and petitioner bears the burden of rebutting this presumption by clear and

21  convincing evidence.  28 U.S.C. § 2254(e)(1) (stating that "a determination of factual issues

22  made by a State court shall be presumed to be correct.  The applicant shall have the burden

23  of rebutting the presumption of correctness by clear and convincing evidence."); *Williams v.*

24  *Rhoades*, 354 F.3d 1101, 1106 (9th Cir. 2004).

25      Where a state court decision is deemed  "contrary to" or an "unreasonable

26  application of" clearly established federal law, the reviewing court must next determine

27  whether it resulted in constitutional error. *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 6 (9th

28

1   Cir. 2002).  On habeas review, the court assesses the prejudicial impact of most

2   constitutional errors by determining whether they "had substantial and injurious effect or

3   influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623

4   (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v.*

5   *Pliler*, 551 U.S. 112 (2007) (*Brecht* standard applies whether or not the state court

6   recognized the error and reviewed it for harmlessness).  The *Brecht* harmless error analysis

7   also applies to habeas review of a sentencing error.  The test is whether such error had a

8   "substantial and injurious effect" on the sentence.  *Calderon v. Coleman*, 525 U.S. 141,

9   145-57 (1998) (holding that for habeas relief to be granted based on constitutional error in

10   capital penalty phase, error must have had substantial and injurious effect on the jury's

11   verdict in the penalty phase.); *Hernandez v. LaMarque*, 2006 WL 2411441 (N.D.Cal., Aug.

12   18, 2006) (finding that even if the evidence of three of petitioner's prior convictions was

13   insufficient, petitioner was not prejudiced by the court's consideration of those convictions

14   because the trial court found four other prior convictions which would have supported

15   petitioner's sentence.)  However, some constitutional errors do not require that the petitioner

16   demonstrate prejudice. *Musladin v. Lamarque*, ___F.3d ___, 2009 WL 331457, * 2 (9th Cir.

17   2009) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *United States v. Cronic*, 466

18   U.S. 648, 659 (1984)). Furthermore, where a habeas petition governed by AEDPA alleges

19   ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), the

20   court applies *Strickland's* prejudice standard and does not engage in a separate analysis

21   applying the *Brecht* standard. *Id.* (citing *Avila v. Galaza*, 297 F.3d 911, 918 n. 7 (2002)).

22   The Court will review Petitioner's claims under the applicable standard of review.

23   **IV.  Deference Owed Factual Findings**

24          As an initial matter, the Court will address Petitioner's blanket assertion that

25   none of the state court's factual findings are entitled to the presumption of correctness which

26   they are normally afforded under 28 U.S.C. § 2254(e)(1).  (docket # 1 at 42, 44)  The

27   AEDPA's presumption of correctness applies to the state court's factual findings.  Petitioner

28

1    bears the burden of "rebutting the presumption of correctness by clear and convincing

2    evidence."  28 U.S.C. § 2254(e)(1).  Petitioner generally argues that the "circumstances

3    surrounding the [post-conviction] hearing and the voluntariness of the plea," the "actions of

4    the state prosecutor and the trial court," and the fact that the post-conviction hearing was

5    conducted in Yavapai County, render the trial court's factual findings incorrect.  (docket # 1

6    at 42-44)  These conclusory allegations are not sufficient to overcome the AEDPA's

7    presumption of correctness.  *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2002) (finding

8    conclusory allegations insufficient to satisfy clear and convincing error standard.)

9    Additionally, Petitioner cannot rebut the presumption of correctness by arguing that the state

10   court evidentiary hearing was inadequate because an evidentiary hearing is not required for

11   AEDPA deference to the state court's factual findings.  *Lambert v. Blodgett*, 393 F.3d 943,

12   969 (9th Cir. 2004) ("We decline to accept [the petitioner's] proposal to inject an 'evidentiary

13   hearing' requirement as a prerequisite to AEDPA deference.").

14        Petitioner further argues that none of the State court's factual findings are

15   entitled to a presumption of correctness because neither the Arizona Court of Appeals nor

16   the Arizona Supreme Court made "individual separate factual findings." (docket # 1 at 42-

17   44) This argument does not rebut the AEDPA's presumption of correctness because "[t]here

18   is no requirement that fact findings by a state trial court be reviewed on the merits by an

19   appellate court in order to be afforded the [AEDPA's] presumption [of correctness]."

20   *Wallace v. Price*, 265 F.Supp.2d 545, 567 (W.D.Pa. 2003).

21        Petitioner further argues that the presumption of correctness does not apply to the

22   state court's resolution of his claims of ineffective assistance of counsel.  (docket # 1 at 42,

23   44)  Petitioner is correct that the ultimate question of whether counsel was ineffective is a

24   mixed question of law and fact to which the ADEPA presumption of correctness does not

25   apply.  However, the presumption of correctness does apply to "state court findings of fact

26   made in the course of resolving claims of ineffective assistance of counsel."  *Lambert*, 393

27   F.3d at 977.  Similarly, although the voluntariness of a guilty plea is a question of law not

28

1   subject to deferential review, *Marhsall v. Lonberger*, 459 U.S. 422, 431 (1983), findings of

2   historical fact underlying a court's determination of voluntariness are entitled to deference.

3   *Iaea v. Sunn*, 800 F.2d 861, 864 (9th Cir. 1986) ("Findings of historical facts underlying a

4   court's conclusion of [a guilty plea's] voluntariness are given deference in a habeas

5   proceeding.")

6        Petitioner has not shown by clear and convincing evidence that *none* of the State

7   court's findings of fact are entitled to the AEDPA's presumption of correctness.  However,

8   the Court's finding regarding Petitioner's global challenge to the state court's factual

9   findings does not preclude the Court from finding that several of the state court's specific

10  factual findings may not be entitled to deference.

11  **V.  Analysis**

12        **A.  Voluntariness of Plea**

13        Petitioner claims his guilty plea was involuntary because: (a) he relied on Judge

14  Mackey's promises to impose a particular sentence; (b) he was under the influence of a large

15  dose of Lorezapam during the change-of-plea hearing; and (c) he relied on counsel's

16  avowals that Judge Mackey would impose a particular sentence.  (docket # 1 at 7-8, 17, 20-

17  23, 30-32, 34-36)

18        The United States Supreme Court law governing the voluntariness of a guilty

19  plea is *Brady v. United States*, 397 U.S. 742 (1970) and its progeny.  The Supreme Court has

20  held that "the Constitution insists, among other things, that the defendant enter a guilty plea

21  that is 'voluntary' and that the defendant must make related waivers 'knowing[ly],

22  intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely

23  consequences.'"  *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (quoting *Brady*, 397 U.S.

24  at 748).  A guilty plea is valid if it is entered voluntarily and intelligently considering the

25  totality of the circumstances.  *Brady*, 397 U.S. at 749; *Boykin v. Alabama*, 395 U.S. 238,

26  242-44 (1969).  The central question is "'whether the plea represents a voluntary and

27  intelligent choice among the alternative courses of action open to the defendant.'"  *Hill v.*

28

*Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).  Although it is fundamental that a guilty plea must be voluntary and intelligent, *Boykin*, 395 U.S. at 242-44, a plea is not involuntary "simply because it is induced by the promise of a recommendation of a lenient sentence, and thus by the fear of a greater penalty upon conviction after a trial." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).  However, a guilty plea may be involuntary where it is induced by threats, misrepresentations, or promises "that are by their nature improper." *Mabry v. Johnson*, 467 U.S. 504, 509 (1984).

### 1. Judge Mackey's Representations

Petitioner first argues that his plea was involuntary because Judge Mackey participated in the plea negotiations and represented that he would impose a particular sentence if Petitioner pled guilty.  (docket # 1)

Federal Rule of Criminal Procedure 11 prohibits federal judges from participating in plea negotiations because the "judge's participation in plea negotiations is inherently coercive." *United States v. Barrett*, 982 F.2d 193, 194 (6th Cir. 1992); Fed.R.Crim.P. 11(e)(1). Rule 11 does not apply to state court judges and is not constitutionally mandated.  *See Frank v. Blackburn* , 646 F.2d 873, 882 (5th Cir. 1980); *Toler v. Wyrick*, 563 F.2d 372, 374 (8th Cir. 1977); *Waddy v. Heer*, 383 F.2d 789, 794-95 (6th Cir. 1967).  A federal court, however, may set aside a state court plea bargain if persuaded that the trial judge's participation denied the defendant the due process of law by causing him not to understand the nature of the charges against him or the consequences of a guilty plea, or if the judge's participation coerced the defendant to enter into a plea involuntarily.  *See Frank v. Blackburn*, 646 F.2d 873, 882 (5th Cir. 1980).

Here, the state court's conclusion that Petitioner's guilty plea was not rendered involuntary due to the trial judge's statements is neither contrary to, nor an unreasonable application of, Supreme Court law.  28 U.S.C. § 2254(d).   Judge Mackey engaged in off-the-record plea negotiations with counsel.  Petitioner did not participate in the negotiations with Judge Mackey.  There is no evidence in the record that Judge Mackey threatened or

1    coerced Petitioner into pleading guilty.  The trial judge's statements regarding sentencing

2    were not made in Petitioner's presence, but were conveyed to Petitioner through counsel.

3    There is no evidence that Judge Mackey used coercive language or made any threats.  *See*

4    *Longval v. Meachum*, 651 F.2d 818 (1st Cir. 1981), *vacated and remanded*, 458 U.S. 1102

5    (1982) (trial judges' "plea-or-else" language was coercive and rendered plea involuntary);

6    *Damiano v. Gaughan*, 592 F. Supp. 1222 (D.Mass. 1984) (rejecting claim that guilty plea

7    was involuntary where trial judge told petitioner's counsel that he would consider a reduced

8    sentence if petitioner cooperated with police).

9            During plea negotiations, outside of Petitioner's presence, Judge Mackey

10   expressed his view that the State should be willing to make an offer that included prison

11   time on count one and probation on count two.  (docket # 1 at 17, Tr. at 5/24/05 at 67-83)

12   Judge Mackey did not promise to impose that particular sentence, however, and repeatedly

13   reminded Petitioner during the change of plea hearing that he could receive a sentence of up

14   to 22.5 years.  (Respondents' Exh. A at Tr. 4/30/04 at 3-4, 7-8, 17-20)

15           Before accepting Petitioner's guilty plea, Judge Mackey engaged in a plea

16   colloquy during which Petitioner stated that he understood the sentencing range he would

17   face and the rights he would waive by pleading guilty.  (Respondents' Exh. A at 12-20)

18   Petitioner stated that the plea agreement contained all the terms he expected, and that he had

19   not received any additional promises that were not contained in the agreement.

20   (Respondents' Exh. A at 12-20)

21           Judge Mackey's alleged promise to impose a particular sentence did not render

22   Petitioner's guilty plea involuntary.  On post-conviction review, the trial court conducted an

23   evidentiary hearing where it observed several witnesses testify and was able to assess their

24   credibility.  Based on the state court record and the testimony adduced at the evidentiary

25   hearing, the trial court found no support for Petitioner's claim that Judge Mackey had

26   promised to impose a particular sentence.  (Respondents' Exh. L at 1-4)  This finding is

27   supported by Judge Mackey's testimony that he made no such promises (Respondents' Exh.

28

1    J at 17-20, 26-27, 46), Terry Gray's testimony that she did not hear Judge Mackey make

2    such promises during plea negotiations (Respondents' Exh. K at 36, 46), and Judge

3    Mackey's statements during the change-of-plea hearing advising the victim and her mother

4    that Petitioner could be receive over 22 years imprisonment under the plea agreement.

5    (Respondents' Exh. A at 3-10, 17-20; Exh. B at 3)

6            On habeas corpus review, this Court defers to the state court's factual findings

7    which were based on an assessment of witness credibility.  *Aiken v. Blodgett*, 921 F.2d 214,

8    217 (9th Cir. 1990) ("Section 2254(d) 'gives federal habeas courts no license to redetermine

9    credibility of witnesses whose demeanor has been observed by the state trial court.'")

10   (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).  The Court concludes that the

11   State court's determination that Judge Mackey did not promise to impose a particular

12   sentence is not an unreasonable determination of the facts in light of the record before the

13   court on post-conviction review.  28 U.S.C. § 2254(e)(1).  Because the trial court found that

14   Judge Mackey did not promise to impose a particular sentence, its conclusion that Petitioner

15   did not involuntarily plead guilty in reliance on such a promise is neither contrary to nor an

16   unreasonable application of federal law.   *See* 28 U.S.C. § 2254(d).

17           **2.  Medicated State**

18           Petitioner next argues that his plea was involuntary because of his "mental

19   condition based on the fact that he was over medicated with prescribed drugs during the plea

20   negotiations and during the change of plea hearing."  (docket # 1 at 7-8, 34)  The state court

21   rejected this claim on post-conviction review. (Respondents' Exh. L)

22           The Court finds that the state court's conclusion that Petitioner's Lorazepam

23   consumption did not render his plea involuntary is neither contrary to, nor an unreasonable

24   application of, federal law or based on an unreasonable determination of the facts.  28

25   U.S.C. § 2254(d).  The trial court conducted an evidentiary hearing during which several

26   witnesses testified regarding Petitioner's demeanor during the change-of-plea hearing.  Dr.

27   Williams, a friend of Petitioner, and the victim's mother both testified that Petitioner did not

28

1    appear confused or sleepy during the change-of-plea hearing.  Likewise, Petitioner's defense

2    counsel testified that Petitioner's mental ability was not impaired during the change-of-plea

3    hearing.  (Respondents' Exh. J at 38-40)  And, during the change-of-plea hearing itself,

4    Petitioner stated that the medications were "acting normally" for him.  (Respondents' Exh. J

5    at 16-17)  Based on the foregoing testimony, the state court concluded that Petitioner was

6    not impaired during the change-of-plea hearing.  (Respondents' Exh. L)

7            Although contrary evidence was also presented at the hearing by Petitioner's ex-

8    wife who testified that Petitioner appeared "passive" and did not remember the change-of-

9    plea hearing (Respondents' Exh. J at 161-64), and by Petitioner who testified that he was

10   "unconscious" during the change-of-plea hearing (Respondents' Exh. J at 138-39), this

11   Court defers to the State court's factual findings and cannot reassess the credibility

12   determinations made by the state court which observed the testimony.  28 U.S.C. §

13   2254(e)(1).

14           The Court concludes that Petitioner has not shown that the state court's decision

15   that "[a]t the time of the entry of the plea, [Petitioner] was not under the influence of

16   medications to the extent is his plea is not voluntary," is contrary to federal law, rests on an

17   unreasonable application of federal law, or is based on an unreasonable determination of the

18   facts.  28 U.S.C. § 2254(e).  Accordingly, Petitioner is not entitled to relief on this ground.

19                          **3.  Representations of Counsel**

20           Petitioner further argues that his plea was involuntary because of his "absolute

21   reliance on his lawyer who provided erroneous advice."  (docket # 1 at 8, 31)  Although the

22   habeas petition casts the arguments challenging the voluntariness of Petitioner's guilty plea

23   and those challenging Griffen's representation in connection with the plea as two separate

24   theories, Petitioner's guilty plea limits the grounds upon which he can subsequently

25   challenge his detention.  The Supreme Court has explained that "[w]here, as here, a

26   defendant is represented by counsel during the plea process and enters his plea upon the

27   advice of counsel, the voluntariness of the plea depends on whether counsel's advice was

28

1    within the range of competence demanded of attorneys in criminal cases.... [A] defendant

2    who pleads guilty upon the advice of counsel 'may only attack the voluntary and intelligent

3    character of the guilty plea by showing that the advice he received from counsel was

4    [ineffective].' " *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985) (quoting *Tollett*, 411 U.S. at

5    267) (internal quotation marks and citation omitted). Because Petitioner pled guilty upon the

6    advice of counsel, he is limited to challenging his plea by demonstrating that counsel's

7    advice did not constitute effective representation. *See also Bordenkircher v. Hayes*, 434 U.S.

8    357, 363 (1978) ("Defendants advised by competent counsel and protected by other

9    procedural safeguards are presumptively capable of intelligent choice in response to

10   prosecutorial persuasion...."); *Worthen v. Meachum*, 842 F.2d 1179, 1184 (10th Cir. 1988),

11   *overruled on other grounds by Coleman v. Thompson*, 501 U.S. 722 (1991) (stating that

12   "[w]hen an involuntariness claim rests on the faulty legal decisions or predictions of defense

13   counsel, the plea will be deemed constitutionally involuntary only when the attorney is held

14   to have been constitutionally ineffective."). *See also Iaea v. Sunn*, 800 F.2d 861, 866 (9th

15   Cir. 1986) (noting that to the extent that petitioner argued that his plea was involuntary due

16   to counsel's erroneous advice, his claim was foreclosed by *Hill* unless he could establish

17   prejudice).  Accordingly, the Court will consider Petitioner's claim of ineffective assistance.

18                     **B.  Ineffective Assistance of Trial Counsel**

19          In Ground 2, Petitioner asserts that trial counsel was ineffective for advising him

20   that Judge Mackey intended to impose a sentence of five years, followed by lifetime

21   probation.  (docket # 1 at 8, 11, 17-20, 28, 35, 41)  He further argues that his reliance on

22   counsel's erroneous advice renders his plea involuntary.  As discussed below, Petitioner is

23   entitled to habeas corpus relief based on this claim.

24                     **1.  Controlling Law**

25          The "clearly established" Supreme Court law governing claims of ineffective

26   assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).  To establish

27   ineffective assistance, petitioner must show both that his counsel's performance was

28

1   deficient and that counsel's deficient performance prejudiced his defense. *Strickland*, 466

2   U.S. at 687. The two-part *Strickland* test "applies to challenges to guilty pleas based on

3   ineffectiveness of counsel." *Hill v. Lockhart*, 474 U.S. 52, 56-58 (1985) (stating that the

4   *Strickland* standard applies equally to a defendant who has been "represented by counsel

5   during the plea process and enters his plea upon the advice of counsel . . . .").

6           To be deficient, counsel's performance must fall "outside the wide range of

7   professionally competent assistance" demanded in criminal cases. *Strickland*, 466 U.S. at

8   690. When reviewing counsel's performance, the court engages a strong presumption that

9   counsel rendered adequate assistance and exercised reasonable professional judgment.

10  *Strickland*, 466 U.S. at 690. "A fair assessment of attorney performance requires that every

11  effort be made to eliminate the distorting effects of hindsight, to reconstruct the

12  circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

13  perspective at the time." *Strickland*, 466 U.S. at 689. Review of counsel's performance is

14  "extremely limited." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on

15  other grounds*, 525 U.S. 141 (1998). Acts or omissions that "might be considered sound

16  trial strategy" do not constitute ineffective assistance of counsel. *Strickland*, 466 U.S. at

17  689.

18          To establish a Sixth Amendment violation, petitioner must also establish that he

19  suffered prejudice as a result of counsel's deficient performance. *Strickland*, 466 U.S. at

20  691-92; *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) (stating that "a violation

21  of the Sixth Amendment right to effective representation is not 'complete' until the

22  defendant is prejudiced.") To show prejudice, petitioner must demonstrate a "reasonable

23  probability that, but for counsel's unprofessional errors, the result of the proceeding would

24  have been different. A reasonable probability is a probability sufficient to undermine

25  confidence in the outcome." *Strickland*, 466 U.S. at 694; *Hart*, 174 F.3d at 1069; *Ortiz v.

26  Stewart*, 149 F.3d 923, 934 (9th Cir. 1998). In the context of a guilty plea, a petitioner

27  "must show that there is a reasonable probability that, but for counsel's errors, he would not

28

1  have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 57-59.

2  Petitioner bears the burden of proving prejudice, the mere possibility that he suffered

3  prejudice is insufficient to satisfy *Strickland's* prejudice prong.  *Cooper v. Calderon*, 255

4  F.3d 1104, 1109 (9th Cir. 2001).  The court may proceed directly to the prejudice prong.

5  *Jackson v. Calderon*, 211 F.3d 1148, 1155 n. 3 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at

6  697).  The court, however, may not assume prejudice solely from counsel's allegedly

7  deficient performance.  *Jackson*, 211 F.3d at 1155.

8        On habeas review, the court must give "substantial weight" to the state court's

9  analysis of a claim of ineffective assistance.  *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir.

10  2000).  The habeas court considers whether the state court applied *Strickland* unreasonably:

11      For [a petitioner] to succeed [on an ineffective assistance of counsel
   claim], . . . he must do more than show that he would have satisfied

12  *Strickland's* test if his claim were being analyzed in the first instance,
   because under § 2254(d)(1), it is not enough to convince a federal

13  habeas court that, in its independent judgment, the state-court decision
   applied *Strickland* incorrectly.  Rather, he must show that the [state

14  court] applied *Strickland* to the facts of the case in an objectively
   unreasonable manner.

15  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002) (citation omitted).  *See also Woodford v.*

16  *Visciotti*, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause,

17  a federal habeas court may not issue the writ simply because that court concludes in its

18  independent judgment that the state-court decision applied *Strickland* incorrectly.  Rather, it

19  is the habeas petitioner's burden to show that the state court applied *Strickland* to the facts of

20  his case in an objectively unreasonable manner.") (citations omitted). *See also Price v.*

21  *Vincent*, 538 U.S. 634, 640 (2003) (stating that the burden is on the habeas petitioner to

22  show the state court applied Supreme Court precedent in an unreasonable manner).

23        **2.  Analysis of Petitioner's claim**

24        On post-conviction review, the state court concluded that Petitioner "failed to

25  establish Defense counsel performed deficiently under prevailing professional norms."

26  (Respondents' Exh. L)  The state court's conclusion was based on its factual findings and

27  legal conclusions that:

28

1. Defense counsel promptly advised [Petitioner], and his family, of the plea offer, and fully explained the terms of the plea, including the statutory sentencing requirements and possibilities.  (Respondents' Exh. L)

2. Defense counsel made it clear, and [Petitioner] understood, there were "no guarantees" as to sentencing.

3. Defense counsel advised Defendant sufficiently to permit Defendant to make a reasonably informed decision whether to accept or reject the plea offer.

4. Defense counsel complied with the American Bar Association Standards for Criminal Justice.

5. Counsel did not "recklessly misinform" [Petitioner] of the contents or effects of the plea.

6. At the time of the entry of the plea, the Court made specific inquiry of [Petitioner] whether had his attorney told him of other agreements as to what was going to happen to him, and [Petitioner] advised the Court that there were no other agreements.

7. Defense counsel's honest, but inaccurate assessment of the Judge's unexpressed sentencing intentions did not constitute ineffective assistance of counsel.

(Respondents' Exh. L)   The court finds that paragraph numbers 1, 2 and 6 are factual findings and the remaining paragraphs are legal conclusions.

The ultimate question of whether counsel was ineffective is a mixed question of law and fact to which the ADEPA presumption of correctness does not apply.  28 U.S.C. § 2254(e)(1).   "Consequently, federal court reviewing a state court conclusion on a mixed issue involving questions both of fact and law must first separate the legal conclusions from the factual determinations that underlie it.   *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).  The Court finds that paragraph numbers 1, 2 and 6 are factual findings and the remaining paragraphs are legal conclusions.

Thus, the state court's legal conclusions that (1) "Defense counsel advised Defendant sufficiently to permit Defendant to make a reasonably informed decision whether to accept or reject the plea offer;" (2) "Defense counsel complied with the American Bar Association Standards for Criminal Justice;" (3) Counsel did not "recklessly misinform" [Petitioner] of the contents or effects of the plea;" (4) "Defense counsel's honest, but

1   inaccurate assessment of the Judge's unexpressed sentencing intentions did not constitute

2   ineffective assistance of counsel;" (5) "Petitioner has failed to established Defense counsel

3   performed deficiently under prevailing professional norms," and (6) "Petitioner knowingly,

4   intelligently, and voluntarily entered into the plea agreement with the State of Arizona, may

5   be overturned only if they are contrary to, or involve an unreasonable application of, clearly

6   established Supreme Court precedent.

7            As discussed below, the Court finds that the state court's denial of Petitioner's

8   claim of ineffective assistance of counsel was based on an unreasonable determination of the

9   facts in light of the evidence presented.  Federal courts may not grant habeas relief based

10  upon an error in a state court factual determination, unless the state decision "was based on

11  an unreasonable determination of the facts in light of the evidence presented in the State

12  court proceeding." 28 U.S.C. § 2254(d)(2). "Or, to put it conversely, a federal court may not

13  second-guess a state court's fact-finding process unless, after review of the state-court

14  record, it determines that the state court was not merely wrong, but actually unreasonable."

15  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.2004).  A state court decision is based on an

16  unreasonable determination of the facts if "an appellate panel, applying the normal standards

17  of appellate review, could not reasonably conclude that the finding[s][are] supported by the

18  record." *See Taylor*, 366 F.3d at 1000.  Once a state court's fact-finding process survives an

19  "unreasonable determination" challenge, the state court's findings of fact are presumed to be

20  correct. *Id*.; 28 U.S.C. § 2254(e)(1).  To overcome this presumption, a habeas petitioner

21  must show by clear and convincing evidence that the state court's factual findings were in

22  error. *See* 28 U.S.C. § 2254(e)(1); *Taylor*, 366 F.3d at 1000 ( "State-court fact-finding may

23  be overturned based on new evidence presented for the first time in federal court only if such

24  new evidence amounts to clear and convincing proof that the state-court finding is in

25  error.").

26           As discussed below, the state court's factual findings (paragraphs 1, 2 and 6 of

27  the "Ineffective Assistance" discussion, Exh. L at 7) are based on a selective review of the

28

1    record and the testimony presented during the post-conviction hearing, and ignore

2    significant evidence which supports Petitioner's claim of ineffective assistance.  "[A]n

3    appellate panel, applying the normal standards of appellate review, could not reasonably

4    conclude that the finding[s][are] supported by the record." *See Taylor*, 366 F.3d at 1000.

5    Thus, those findings are not entitled to deference under 2254(d).

6              **a.  Counsel's Performance**

7              "In the context of a guilty plea, the ineffectiveness inquiry probes whether the

8    alleged ineffective assistance impinged on the defendant's ability to enter an intelligent,

9    knowing and voluntary plea of guilty." *Lambert*, 393 F.3d at 980.  To prevail on such a

10   claim, the petitioner must show that counsel's assistance was not within the range of

11   competence demanded of counsel in criminal cases and that the defendant suffered actual

12   prejudice as a result.  *Hill*, 474 U.S. at 59.  A deficient performance is one in which counsel

13   made errors so serious that he was not functioning as the counsel guaranteed by the Sixth

14   Amendment.  *Strickland*, 466 U.S. at 687.

15             Because a guilty plea waives a criminal defendant's Fifth Amendment

16   protections against compulsory self-incrimination, the right to a jury trial, and the right to

17   confront one's accusers, . . . it must be a knowing, intelligent act "done with sufficient

18   awareness of the relevant circumstances and likely consequences." *Iaea v. Sunn,* 800 F.2d

19   861, 865 (9th Cir. 1986) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970) (internal

20   citations omitted).  "Because 'an intelligent assessment of the relative advantages of

21   pleading guilty is frequently impossible without the assistance of an attorney,'. . . counsel

22   have a duty to supply criminal defendants with necessary and accurate information." *Iaea*,

23   800 F.2d at 865.  "A defendant who pleads guilty upon the advice of counsel may only

24   attack the voluntary and intelligent character of the plea by showing that the advice he

25   received from counsel was not within the range of competence demanded of attorneys in

26   criminal cases." *United States v. Signori*, 844 F.2d 635, 638 (9th Cir. 1988) (citing *Tollet v.

27   Henderson*, 411 U.S. 258, 267 (1973); *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

28

Petitioner's claim of ineffective assistance of counsel rests on his allegation that counsel led him to believe that the court would "impose a sentence of [five] years on count one and life time probation on count two."  (docket # 1 at 37)  A guilty plea cannot be "induced by . . . misrepresentation."  *Brady*, 397 U.S. at 755.  Although a mere inaccurate prediction of a defendant's sentence, standing alone, would not constitute ineffective assistance, *see McMann v. Richardson*, 397 U.S. 759, 770 (1970); *Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990), "the gross mischaracterization of the likely outcome [of the plea], combined with the erroneous advice on the possible effect of going to trial, falls below the level of competence required of defense attorneys.  *See Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986) and *Chacon v.Wood*, 36 F.3d 36 F.3d 1459, 1464 (9th Cir. 1994), *overruled on other grounds by statute*, 28 U.S.C. § 2253(c).  Likewise, "counsel's misrepresentations as to what [a defendant's] sentence in fact would be" may render a defendant's plea involuntary.  *Chizen v. Hunter*, 809 F.2d 560, 562 (9th Cir. 1986); *Mayes v. Pickett*, 537 F.2d 1080, 1083-84 (9th Cir. 1976) (holding that even an exemplary Rule 11 record in a federal plea proceeding was inadequate to determine the appellant's claims of involuntariness where he asserted that his attorney made promises regarding his sentence.)

In this case, during the post-conviction hearing, Petitioner's trial counsel testified that he explained the plea agreement to Petitioner and emphasized that it did not guarantee a particular sentence.  (Respondents' Exh. J at 81, 96, 99, 117-19)  The state court found that Petitioner's "counsel made it clear . . . there were 'no guarantees' as to sentencing."  (docket # 11-12 at 7, Respondents' Exh. L)  The state court, however, ignored Griffen's other statements regarding the sentence which Petitioner could expect if he pled guilty, Petitioner's lack of experience with the criminal justice system, and  Petitioner's extreme reluctance to accept a plea which exposed him to a sentence greater than 7.5 years.

During the evidentiary hearing, Griffen testified that he could not point to any specific statements that Judge Mackey made that would have led him to believe that Judge Mackey was going to give Petitioner a sentence of five to seven and a half years, followed

1    by lifetime probation.  (Respondents' Exh. J at 73)  Rather, he testified that "the constant

2    theme [of the off-the-record negotiations] was, "why isn't this a fair disposition.  Why isn't

3    a two count, some prison followed by probation [an] available deal where I can give him up

4    to the maximum term in the first count, year in the county jail on the second count, with

5    consecutive probation?"  (Respondents' Exh. J at 73-74)  Griffen testified that Judge

6    Mackey gave him the impression that, if Petitioner accepted the plea, he would impose a

7    sentence of 5 to 7.5 years imprisonment followed by lifetime probation.  (Respondents' Exh.

8    J at 71-80, 84)  The relevant plea offer provided that Petitioner would plead guilty to one

9    count of attempted sexual conduct with a minor, and to one count of sexual abuse.  (docket #

10   14)  Griffen testified that he advised Petitioner to accept the plea offer because, based on his

11   25 years of experience, a judge - including Judge Mackey - would not "backtrack" on his

12   representations regarding sentencing.  (Respondents' Exh. J at 80-81)

13           Griffen testified that he thought that Judge Mackey had "agreed" to sentence

14   Petitioner to a mandatory prison term on the sexual abuse count, followed by lifetime

15   probation on the attempted sexual conduct count - which Griffen described as a sentence of

16   "mandatory prison, five to seven and a half, plus a consecutive probationary term on the

17   attempted count."  (Respondents' Exh. J at 95)  Griffen admitted that the written plea

18   agreement did not reflect that sentence, "[b]ecause there wasn't an agreement with [the

19   County Attorney's] office to that extent."  (Respondents' Exh. J at 95)  Counsel reiterated

20   that "there was no agreement between [the County Attorney's] office and [defense

21   counsel's] office that" Petitioner would be sentenced to a prison term of 5 to 7.5 years,

22   followed by lifetime probation.  (Respondents' Exh. J at 95-96)  Griffen also admitted that

23   he was aware that Judge Mackey "insisted" on having "adequate discretion in any plea

24   agreement to do what he thought was appropriate."  (Respondents' Exh. J at 96-97)

25           Despite having only an "impression" that Judge Mackey would impose lifetime

26   probation on count 2, his knowledge that Judge Mackey insisted on having sentencing

27   discretion, and his knowledge that the County Attorney had not agreed to a sentence which

28

1  included a prison term of 5 to 7.5 years followed by lifetime probation, Griffen conveyed to

2  Petitioner that Judge Mackey had given "every . . . indication" that he would sentence

3  Petitioner "somewhere between five and seven and a half [years imprisonment], followed by

4  lifetime [probation.]"  (Respondents' Exh. J at 80)

5          Griffen also testified that he did not specifically advise Petitioner of the potential

6  consequences of his plea — the potential prison sentence he could face under the plea

7  agreement.  *See Iaea*, 800 F.2d at 864-65 (finding counsel ineffective and plea involuntary

8  where counsel inaccurately predicted the sentence and misinformed petitioner about the

9  consequences of going to trial).  Rather than specifically advising Petitioner "[that he could]

10  get prison on Count I with the range of five, ten, 15 [years imprisonment]," (Respondents'

11  Exh. J at 99), Griffen testified that it is "more likely" he would have simply told Petitioner

12  "there is no guarantee.  It could go either way." (Respondents' Exh. J at 99)  In view of the

13  foregoing, the state court's finding that counsel "fully explained the terms of the plea

14  including the statutory sentencing requirements and possibilities" is an unreasonable

15  determination of the facts.  (Respondents' Exh. L)

16          Further, although counsel told Petitioner that there was "no guarantee" as to the

17  specific sentence the judge would impose, he diluted that statement by also advising

18  Petitioner that Judge Mackey would not back track on his word — in other words, he told

19  Petitioner that there was a guarantee.  Griffen testified that he told Petitioner "two things. . .

20  One, I made sure he understood there was *no guarantee*, and I don't think he misunderstood

21  that, *but I also told him, quite strongly*, that in my opinion, that *every indication was from*

22  *the judge that the judge was championing, he was the leader at this point trying to pursue a*

23  *plea that gave probationary discretion*, and I believe that was his intention by reasons of his

24  negotiations, close door session." (Respondents' Exh. J at 81) (emphasis added).  Griffen

25  further testified that he "told [Petitioner] that in [his] . . . *25 years of experience*, [he] was

26  confident that based upon discussions that had occurred among the parties in chambers, that

27  Judge Mackey was *absolutely inclined to afford [Petitioner] probation*.". . . "I conveyed that

28

1  to [Petitioner] and conveyed to him that I believe that no judge would do that, and then

2  change course with out fair warning . . . ."  (Respondents' Exh. J at 81)

3         The post-conviction court isolated counsel's statement to Petitioner that there

4  was "no guarantee" about sentencing, but ignored counsel's self-described "strong"

5  statements to Petitioner that Judge Mackey had given his word that he would impose

6  lifetime probation on count 2, and that in counsel's 25 years of experience, a trial judge

7  would never go back on his word without warning.  Thus, on the one hand, counsel said "no

8  guarantees," but then he said, a judge would not go back on his word - which essentially

9  constitutes a guarantee.  Defense counsel's representations to Petitioner that "Judge Mackey

10  was absolutely inclined to afford [Petitioner] probation" combined with counsel's statement

11  that, in his 25 years of experience, a judge would not go back on his word negated counsel's

12  warning that there was "no guarantee" about sentencing.

13         Petitioner was ultimately sentenced to 15 years' imprisonment on the attempted

14  sexual conduct with a minor count, and to a consecutive presumptive term of five years

15  imprisonment on the sexual abuse count.  (Respondents' Exh. C at 54-58)  Counsel advised

16  Petitioner that Judge Mackey would sentence him to five year's imprisonment on the

17  attempted sexual conduct count, and to lifetime probation on the sexual abuse count.  In so

18  doing, counsel did more than inaccurately predict Petitioner's ultimate sentence.  *But see*

19  *United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999) (stating that "an attorney's

20  mere inaccurate prediction of a sentence does not demonstrate the deficiency component of

21  an ineffective assistance of counsel claim."); *United States v. Gordon*, 4 F.3d 1567, 1570

22  (10th Cir. 1993) ("A miscalculation or erroneous sentence estimation by defense counsel is

23  not a constitutionally deficient performance rising to the level of ineffective assistance of

24  counsel.")  Rather, counsel affirmatively misrepresented to Petitioner that Judge Mackey

25  had given his word that he would impose lifetime probation and that, even though that

26  promise was not reflected in the plea agreement and Judge Mackey wanted to retain

27  sentencing discretion, Judge Mackey would not go back on his word.  *See Chizen v. Hunter*,

28

1  809 F.2d 560 (9th Cir. 1986) (finding that counsel's misrepresentation that the judge had

2  agreed to the specific sentence in the plea agreement constituted ineffective assistance and

3  rendered the plea involuntary and that defense counsel's misrepresentation was sufficient to

4  surmount the imposing barrier imposed by petitioner's statements during the plea hearing.).

5          In addition to ignoring the foregoing circumstances, the post-conviction court

6  ignored a critical event that took place during the change-of-plea hearing.  During the

7  change-of-plea hearing, when Judge Mackey was addressing Petitioner, he interjected about

8  certain "intentions" that he had been promised.  (Tr. 4/30/04 at 13)  Counsel, however,

9  interrupted Petitioner and told him that further discussion would result in the court rejecting

10 the plea.  (Tr. 7/16/04 at 55-56; Tr. 5/24/05 at 130, 135, 136, 139)  Thereafter, the trial court

11 inquired whether the "plea agreement sets forth all the agreements you have about what's

12 going to happen to you?" (Tr. 4/30/04 at 14)  Petitioner "nodd[ed]" which the court

13 interpreted as "yes," and Petitioner confirmed "Yes."  (Tr. 4/30/04 at 14)

14         On post-conviction review, the trial court ignored Petitioner's interjection at the

15 change-of-plea hearing.  (docket # 11-12)  The post-conviction court concluded that "[a]t the

16 time of the entry of the plea, the Court made specific inquiry of [Petitioner] whether had his

17 attorney told him of any other agreements as to what was going to happen to him, and

18 [Petitioner] advised the Court there were no other agreements."  (Respondents' Exh. L)  The

19 state court, however, failed to discuss the portion of the plea hearing where Petitioner balked

20 at the mention of a 22 year sentence and mentioned that there were other "intentions."

21         In view of the foregoing, the Court finds that the state court's decision is based

22 on an unreasonable determination of the facts.  The record reflects that counsel's

23 performance was deficient in the manner described above.

24         **b.  Prejudice**

25         Having found counsel's performance deficient, the Court will consider whether

26 Petitioner establishes that he was prejudiced thereby.  To satisfy the prejudice prong in the

27 context of a guilty plea, Petitioner "must show that there is a reasonable probability that, but

28

1    for counsel's errors, he would not have pleaded guilty and would have insisted on going to

2    trial." *Hill*, 474 U.S. at 59.  As set forth below, "[t]he record is replete with evidence that

3    [Petitioner] was very reluctant to plead guilty." *See Iaea v. Sunn*, 800 F.2d at 865

4    (remanding to district court to determine whether petitioner established prejudice where

5    record indicated that petitioner was reluctant to plead guilty).  Additionally, the "special

6    circumstances" in this case indicate that Petitioner placed particular reliance on counsel's

7    advice in deciding whether to plead guilty.  *Hill*, 106 S.Ct. at 371.

8             On June 6, 2002, Petitioner was indicted on eight counts of dangerous crimes

9    against children.  He had no prior experience with the criminal justice system.  (Tr. 7/16/04

10   at 44; Tr. 5/24/05 at 9. 38, 56, 120, 121, 152; Tr. 6/7/05 at 11, 12, 21)  Petitioner had a

11   history of mental illness, and several days after the indictment was filed, he requested an

12   examination pursuant to Ariz.R.Crim.P. 11.  (*Id*.)  Before his arrest, Petitioner was treated

13   by several mental health professionals and after his arrest, he was treated at an in-patient

14   facility in Maricopa County.  (Tr. 5/24/05 at 152-53; Tr. 6/7/05 at 11)

15            Petitioner initially pled not guilty.  The State made numerous plea offers which

16   Petitioner rejected.  For example, one pretrial plea offer proposed "prison with a range of 10

17   to 24, with three other counts eligible for probation . . . ."  (Respondents' Exh. J at 60)

18   Defense counsel testified that such a possible sentence was not "a realistic possibility for

19   Mr. Paige."  (Respondents' Exh. J at 60)  Counsel explained that if Petitioner proceeded to

20   trial, and prevailed on his defense of guilty but insane, he would "not [have] been subjected

21   to prison but to treatment through the mental health system [the state mental hospital]."

22   (Respondents' Exh. J at 60)  Petitioner confirmed that he rejected the pre-trial plea offers

23   because he was mentally ill, and he and his family wanted to make sure that he could receive

24   mental health treatment.  (Tr. 5/24/05 at 124-26, 155)  Petitioner, who was 52 at the time of

25   his arrest and pre-trial proceedings, did not feel that life imprisonment was an option.  (Tr.

26   4/30/04; Tr. 5/24/05 at 124-26, 155)  Because the State did not offer a plea which provided

27   for a short prison term - approximately five years - and probation, Petitioner proceeded to

28

1  trial before a jury.  During post-conviction proceedings, defense counsel testified that

2  Petitioner "was not prepared to accept a significant prison term, period."  (Respondents'

3  Exh. J at 54, Tr. 5/24/05 at 54)

4        The jury trial began on January 14, 2004.  Petitioner's defense was guilty but

5  insane.  (Respondents' Exh. J, Tr. 5/24/05 at 9, 38, 53-56, 93-94, 123, 125, 155)  After ten-

6  days of trial, the jury was unable to reach a verdict and the court declared a mistrial.  (Tr.

7  2/14/04 at 22-23)  After his trial ended in a mistrial, Petitioner "remained desirous of going

8  to trial."  (Respondents' Exh. J at 56-57)   Petitioner's family was prepared to proceed to a

9  second trial and had the finances to cover the trial.  (Respondents' Exh. J at 69)  A second

10  trial was scheduled for April 7, 2004, and plea negotiations resumed.  (Respondents' Exh. J

11  at 66)  Petitioner again refused to consider any plea offers that included extensive prison

12  time.  Petitioner felt that there was no benefit to serving the rest of his life in prison with

13  minimal mental health treatment.  Thus, the only realistic plea offer to Petitioner was one

14  that would result in a short prison term followed by probation.  (Tr. 5/24/05 at 69, 124-26,

15  155)  Petitioner rejected all of the pre-trial and post-trial plea offers that exposed him to a

16  prison term that was much longer than five years.  (*Id.*; Respondents' Exh. J, Tr. 5/24/05 at

17  53-54, 120-26)  During post-conviction proceedings, defense counsel testified that Petitioner

18  would not have taken a plea if he "knew that he was going to be exposed to perhaps more

19  than seven and a half years . . . ."  (Respondents' Exh. J, Tr. 5/24/05 at 54)

20        Petitioner ultimately accepted a plea offer pursuant to which he believed he

21  would receive between 2.5 and 7.5 years imprisonment on the first count, followed by

22  lifetime probation on the second count.  Petitioner accepted this plea in reliance on counsel's

23  representation that Judge Mackey had promised that he would impose a 5 year sentence on

24  count one and probation on count two.  (Tr. 5/24/05 at 76, 77, 80-82, 103, 127, 145, 151,

25  157).  Counsel testified during post-conviction proceedings, that Petitioner "relied on [his]

26  expertise."  (Respondents' Exh. J at 58)  Defense counsel further testified that if "there had

27  been any other statement from [counsel] along the lines that [Petitioner] could face more

28

1    than seven and a half years in prison," Petitioner would not have taken the plea.

2    (Respondents' Exh. J at 72)  Counsel testified that he told Petitioner that "in discussing this

3    with Judge Mackey, that every . . . indication was, he was going to wind up somewhere

4    between five and seven and a half, followed by lifetime [probation.]"  (Respondents' Exh. J

5    at 80)  Counsel testified that "but for that representation, [Petitioner] wouldn't have" taken

6    the plea."  (Respondents' Exh. J at 80)

7           During post-conviction proceedings, Petitioner testified consistently with defense

8    counsel that he relied on counsel's advice and would not have accepted the plea absent his

9    advice.  (Tr. 5/24/05 at 58, 80, 103)   He testified that, if he had believed he would be

10   exposed to more than five years imprisonment, he "wouldn't have gone for"

11    the plea.  I mean I hadn't before.  I wouldn't now.  I felt we were stronger going back to

12   trial the second time."  (Respondents' Exh. J at 141-42)   In assessing Petitioner's claims,

13   the post-conviction court disregarded Petitioner's subjective state of mind which is relevant

14   to determining the voluntariness of a guilty plea.  *Iaea*, 800 F.2d at 866 (stating that to

15   determine the voluntariness of the plea, the court looks to the totality of the circumstances,

16   examining both the defendant's "subjective state of mind" and the "constitutional

17   acceptability of the external forces inducing the guilty plea.").

18          In view of the Petitioner' rejection of numerous plea offers both before and after

19   his trial, which ended in a mistrial, Petitioner's consistent preference for proceeding to trial

20   rather than accepting a plea that exposed him to more than five years imprisonment, and his

21   numerous statements during the post-conviction proceedings that if he had believed the plea

22   agreement exposed him to a sentence of over five years, he would have rejected it, there is a

23   reasonable probability that but for counsel's deficient performance, Petitioner would not

24   have pled guilty and would have proceeded to trial.

25          In view of the foregoing, the Court finds that the state court's application of

26   *Strickland* was objectively unreasonable.  *See Wiggins v. Smith*, 539 U.S. 510, 520-21

27   (2003).  Knowing that the trial judge wanted to retain sentencing discretion and would not

28

1  stipulate to a particular sentence, defense counsel advised Petitioner that the trial judge had

2  "given his word" that he would impose a sentence of five years imprisonment followed by

3  lifetime probation.    Counsel also told Petitioner that, although that agreement was not

4  reflected in the written plea agreement, the trial judge would not "backtrack" from his word,

5  which was "as good of a guarantee" as Petitioner would get in this case.  Petitioner, who had

6  no prior experience with the judicial system, was entitled to credit defense counsel's

7  representation that an agreement existed with Judge Mackey, and to rely on it.  The record

8  reflects that Petitioner's guilty plea was induced by such a representation.  Contrary to

9  Respondents' assertion, the plea colloquy does not cure any defects that may have occurred

10  due to counsel's misrepresentations.  During the plea colloquy, Petitioner tried to express to

11  the court that there were other "intentions" regarding sentencing that were not reflected in

12  the written plea agreement.  However, Petitioner was prevented from voicing his views by

13  counsel and the plea proceeded.  Petitioner again relied on counsel's assurances that an

14  agreement had been reached regarding sentencing and that he should accept the plea.  Due to

15  the circumstances surrounding Petitioner's plea, Petitioner has overcome the "imposing

16  barrier" of his representations made during the plea hearing.  *See Blackledge v. Allison*, 431

17  U.S. 63, 74 (1977).

18        In conclusion, the Court finds that the state court's resolution of Petitioner's

19  claim of ineffective assistance of counsel is based on an unreasonable determination of the

20  facts, which led to an unreasonable application of *Strickland*.  Petitioner is entitled to habeas

21  corpus relief on his claim of ineffective assistance of counsel.  Because the court finds that

22  Petitioner is entitled to habeas relief based on his allegation of ineffective assistance of

23  counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), the Court need only apply

24  *Strickland's* prejudice standard and does not engage in a separate analysis applying the

25  *Brecht* standard.  *Musladin v. Lamarque*, ___F.3d ___, 2009 WL 331457, * 2 (9th Cir. 2009)

26  (citing *Avila v. Galaza*, 297 F.3d 911, 918 n. 7 (2002)).

27        Accordingly,

28

**IT IS HEREBY RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus (docket # 1) be **GRANTED** and that the state court has the discretion to determine the specific relief Petitioner is afforded.  For example, the court may give Petitioner the sentence for which he thought he had bargained, or permit him to withdraw his guilty plea and proceed to trial.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.  The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See,* 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(e), Federal Rules of Civil Procedure.  Thereafter, the parties have ten days within which to file a response to the objections.  Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to file timely objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*, Rule 72, Federal Rules of Civil Procedure.

DATED this 24th day of February, 2009.


Lawrence O. Anderson
United States Magistrate Judge